UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

THIPSUKON KAMNERDPILA,

       Plaintiff,

v.                         Case No. 8:23-cv-2724-VMC-NHA

CITY OF ST. PETERSBURG,

       Defendants.
_____/

**ORDER**

This matter comes before the Court pursuant to Defendant City of St. Petersburg's Amended Dispositive Motion for Summary Judgment (Doc. # 48), filed on January 9, 2025. Plaintiff Thipsukon Kamnerdpila responded on February 6, 2024 (Doc. # 51), and Defendant replied on February 21, 2025. (Doc. # 53). For the reasons that follow, Defendant's Motion is granted in part and denied in part.

**I.   Background**

Ms. Kamnerdpila is Thai-American. (Doc. # 52-2 at 17:20-24). She began working for the City in 2011 as a customer service representative in the call center. (Id. at 17:5-10). In 2015, Ms. Kamnerdpila's position with the City changed, as she began working as an accounting technician with the Billing and Collections Department. (Id. at 16:12-22). There were

1

multiple people who supervised her work: Lauren Gewandter,
Josh Chisholm, Deidre Moultin, and Tionti Thomas. (Id. at
16:10-12). Ms. Gewandter was the Billing Manager for the
Billing and Collections Department for the City. (Doc. # 46
at 1). Ms. Gewandter worked under Tammy Jerome, who was the
director of the Department. (Doc. # 52-1 at 1). Ms. Gewandter
and Ms. Thomas were Ms. Kamnerdpila's main supervisors. (Doc.
# 46 at 2). They also supervised other employees in the
Department, such as Grayson MacKinnon, Kathryn McDow, and
Elizbeth Ridgeway. (Id. at 3-4; Doc. # 52-2 at 23:24-25:11).

On April 15, 2021, Ms. Gewandter issued a memorandum to
the Department reminding the employees of their individual
responsibility to resolve accounts removed from the regular
billing cycle before the next billing cycle. (Doc. # 52-2 at
135). On July 15, 2021, Ms. Kamnerdpila received verbal
counselling and a written memorandum following two erroneous
adjustments she processed on May 24, 2021, and June 14, 2021,
and her failure to complete her work prior to going on
vacation. (Id. at 136). Ms. Kamnerdpila's explanation for the
first error is that she notified Ms. Moulton of her inability
to complete her work while on vacation, which she believed
was an accepted practice at the time. (Doc. # 52-1 at 2).
Her explanation for the second error is that she had asked

her co-worker to complete her work, but that co-worker was unable to do so. (Doc. # 52-2 at 47:3-8).

On August 30, 2021, Ms. Thomas sent an email to the Department containing a guideline for time management and providing a daily schedule by which employees were expected to complete their tasks. (Id. at 143). On November 9, 2021, Ms. Kamnerdpila received another written memorandum for attendance-related misconduct due to calling out of work less than 30 minutes before the start of her workday. (Id. at 137). On that same day, Ms. Kamnerdpila received a formal disciplinary notice regarding a failure to complete her Billing Register in accordance with the August 30, 2021, guidelines. (Id. at 139-40). Ms. Kamnerdpila filed a grievance related to this disciplinary notice, in which she argued that the guideline was not an official policy and that other employees, Mr. Mackinnon and Luis Moreno, frequently failed to complete their reports within the expected timeframe. (Doc. # 52-1 at 3). Ms. Kamnerdpila claims that, in response to her grievance, the City admitted that the guidelines did not constitute official policy. (Id.).

On February 15, 2022, Ms. Kamnerdpila received a second disciplinary notice. (Doc. # 52-2 at 141-42). The notice identified two forms of misconduct: first, that she was

"discourteous in-person and via email and did not follow instructions provided by her supervisors" on December 6, 2021, and February 1, 2022; and second, that she generated incorrect utility bills, as $3,966.92 in credits were incorrectly placed on these accounts. (Id.). As a result of these infractions, she received a two-day suspension and was informed that continued misconduct would result in "progressive discipline, up to and including termination of employment." (Id.). As to the first error, Ms. Kamnerdpila claims that on each event, she was following Department policies and other directives from Ms. Gewandter and Ms. Thomas, but Ms. Moultin did not agree with her actions and became "argumentative" and "acted rudely" in response to her trying to follow the directives from the Department managers. (Doc. # 52-1 at 3). As to the second error, she claims that the notice "grossly misrepresented a minor mistake in order to justify the two day suspension and to push me closer to termination." (Id. at 4).

On April 26, 2022, Ms. Kamnerdpila submitted a written statement to Human Resources alleging discrimination based on her race and/or national origin, and then supplemented it with an age discrimination claim on May 10, 2022. (Doc. # 52-2 at 144-46). Ms. Jerome received a copy of the statement on

May 10, 2022. (Doc. # 52-4 at 32:2). In that statement, Ms. Kamnerdpila claimed that she had "been berated for [her] use of English." (Doc. # 52-2 at 146). As she explained further in her deposition, Ms. Kamnerdpila claimed that Ms. Gewandter told her that her communication was "not understandable, that – that you know, it's just not clear, it's not concise, it's not understandable. It's she – she - she didn't understand." (Id. at 25:20-23). In the statement, Ms. Kamnerdpila asserted that she was "being singled out by fictitious allegations," which demonstrates that she was "working under scrutiny and a hostile work environment." (Doc. # 52-2 at 144). Ms. Kamnerdpila averred that her supervisors were "looking for things that are not a mistake and write [her] up – not write [her] up but suspended [her] for something that did not cause any harm to the City, but yet they were overlooking those things that are more serious that [her] white coworkers [Grayson MacKinnon and Elizabeth Ridgeway] are doing." (Id. at 38:9-13).

In response to Ms. Kamnerdpila's statement to Human Resources, Christopher Guella, the City's Human Resources Director, conducted an investigation. (Doc. # 45 at 2). Mr. Guella interviewed Ms. Jerome, Ms. Gewandter, Freda Exum, Ms. Moultin, Ms. Thomas, Mr. Chisholm, Ms. McDow, and Carolyn

Ferguson. (Id. at 149). In the report on the investigation, Mr. Guella noted "the considerable racial diversity among those disciplined." (Id. at 150). Mr. Guella did not interview Ms. Kamnerdpila or Zalika Santiago, the only other Asian employee within the Department. (Id. at 149). The investigation "found no evidence that management disproportionately disciplined, belittled, or otherwise discriminated against Kamnerdpila because of her national origin and/or age." (Id. at 151).

On May 3, 2022, Ms. Kamnerdpila took leave under the Family and Medical Leave Act ("FMLA") due to a severe sinus infection. (Doc. # 52-1 at 5). At around 5:30 p.m. that day, she went into the office. (Id.). Ms. Kamnerdpila asserts that she did so because she needed to access her work email because she learned from her union representative that it was the last day to submit a form to appeal her two-day suspension. (Id.). She also acknowledged that she knew that she was not supposed to go into the office while sick. (Doc. # 52-2 at 84:16-24). As she arrived, she ran into Ms. Gewandter and Ms. Thomas. (Doc. # 52-1 at 5). She avows that she told them that she "needed to log in briefly to print a form from [her] work email," to which Ms. Gewandter "warned [Ms. Kamnerdpila] that the system was running an update, and [Ms. Kamnerdpila] told

6

[Ms. Gewandter that] [she] only needed to access [her] email."
(Id.). Ms. Kamnerdpila then went to her computer to access
her email, leading Ms. Gewandter to tell her she "could not
turn on [her] computer." (Id. at 6). In response, Ms.
Kamnerdpila called her "Union representative to ask him what
[her] rights were in obtaining [her] grievance form. [She]
could not reach him, so [she] turned [her] computer back off
and left." (Id.). On May 10, 2022, Ms. Kamnerdpila filed a
supplemental report of discrimination related to the
encounter. (Id.).

On May 11, 2022, the City terminated Ms. Kamnerdpila.
(Doc. # 52-2 at 149-51). The accompanying notice issued by
Ms. Jerome, Ms. Gewandter, and Ms. Thomas explained that "Ms.
Kamnerdpila's disregard for her job duties and failure to
follow Departmental policies is unacceptable and adversely
impacts the efficiency of our operations which severely
hampers our ability to appropriately service the public."
(Id. at 150). The notice listed multiple violations,
including two "Group III" violations: one for insubordination
for refusing to leave the building when instructed to by her
supervisors, and one for this being her third violation of
the City's employment policies. (Id. at 149-50). Per the
employee policy handbook, a Group III violation results in

7

dismissal. (Doc. # 45-1 at 7:11). Ms. Jerome concluded that Ms. Kamnerdpila "demonstrated she is unable and unwilling to comply with the requirements for continued employment with the City of St. Petersburg; therefore, termination of her employment is warranted." (Doc. # 52-2 at 150-51).

Ms. Kamnerdpila and her co-workers have different explanations for this series of events. Ms. Santiago, who is also Asian-American, testified that Ms. Kamnerdpila "sat in front of [her] so [she] knew what was going on." (Doc. # 52-6 at 36:12-13). She testified that Ms. Jerome, Ms. Gewandter, Ms. Thomas, and Ms. Moultin "would give [Ms. Kamnerdpila] so much work. They purposely would do it because they knew that she takes her time [to] do her work. So when she doesn't get something completely [done], she tries to write her up because they wanted to get rid of [her] at that time, just as me." (Id. at 36:14-19). When asked whether Ms. Kamnerdpila was treated differently from her co-workers, Ms. Santiago said "yeah" and that "one time when [Ms. Kamnerdpila] had to check adjustment, for example, she was given a certain time, but I can tell you, for example, Grayson MacKinnon . . . was given a different time . . . . He's white . . . . Alyce is white. She was given different time." (Id. at 38:10-16).

Mr. Chisholm shared similar stories. He testified that Mr. Mackinnon and Ms. Ridgeway did "not get written up for attendance issues." (Doc. # 52-7 at 17:14-21). He also asserted that Mr. Mackinnon had "numerous issues with his work that seems to kind of just get brushed over, not taken as seriously as other people having issues with their work." (Id. at 17:25-18:2). He also testified that Ms. Santiago was focused upon for criticism from supervisors. (Id. at 18:15-24).

Ms. Kamnerdpila testified that Mr. Mackinnon would "call in every Monday during football season for a long period of time. You know, they never got in trouble as far as . . . getting to being suspended." (Doc. # 52-2 at 23:9-11). She argued that errors by her co-workers were "overlooked because they're not Asian . . . . Elizabeth Ridgeway who was assigned a rotation job of scanning records to the system, she was a month behind. She didn't get penalized." (Id. at 23:22-24:2). In summary, Ms. Kamnerdpila testified that "there are people who are doing serious mistakes that did not get penalized but yet for [her] they comb through with the comb . . . to find something, and if it didn't fit, they'll try to fit it." (Id. at 24:7-11).

Since the filing of this Motion, Ms. Kamnerdpila submitted a sworn affidavit from Ms. Thomas, who was a middle manager between Ms. Kamnerdpila and Ms. Gewandter. Ms. Thomas's affidavit seeks to correct her prior testimony because she has since resigned and no longer fears retaliation from Ms. Gewandter. (Doc. # 54). Ms. Thomas now avers that she is "aware of multiple instances where non-Asian Accounting Technicians were not penalized for more serious offenses than those attributed to [Ms. Kamnerdpila]." (Doc. # 54-1 at 1-2). She then explains that Ms. Gewandter "often ignored or covered up [Mr. MacKinnon]'s mistakes when [she] brought them to her attention." (Id. at 2). She avows to "have documented evidence that supports these claims" and that "[i]f called as a witness, [she] would testify to the truth of the matters stated in this affidavit." (Id.).

On November 29, 2023, Ms. Kamnerdpila filed a complaint against the City . (Doc. # 1). On July 9, 2024, the Court granted the City's motion to dismiss the complaint in its entirety and granted leave for Ms. Kamnerdpila to amend her complaint. (Doc. # 32).

On July 23, 2024, Ms. Kamnerdpila filed an amended complaint, which is the operative complaint. (Doc. # 33). The amended complaint contains four counts: violation of Title

VII of the Civil Rights Act for discrimination on the basis of race, color, and national origin (Count One); violation of Title VII of the Civil Rights Act in retaliation for engaging in protected activity (Count Two); violation of the Florida Civil Rights Act for discrimination on the basis of race, color, and national origin (Count Three); and violation of the Florida Civil Rights Act in retaliation for engaging in protected activity (Count Four). (Id.).

The City filed its Amended Dispositive Motion for Summary Judgment on January 9, 2025. (Doc. # 48). Ms. Kamnerdpila responded on February 6, 2025 (Doc. # 51), and the City replied on February 21, 2025. (Doc. # 53). The Motion is ripe for review.

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting Celotex Corp., 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true, and all reasonable inferences must be drawn in the

non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III. **Discussion**

### A. **Motion to Supplement the Record**

As an initial matter, the Court notes that Ms. Kamnerdpila filed a Motion to Supplement the Record (Doc. # 54), which seeks to supplement the record with an affidavit from Ms. Thomas. (Doc. # 54-1). Ms. Kamnerdpila represents that "[t]his evidence was not included in Plaintiff's Response because Ms. Thomas did not discuss these issues in her deposition [as] she feared retaliation. She has since resigned from her position with the City and wants to correct her previous testimony." (Doc. # 54 at 3). The Local Rule 3.01(g) certification indicated that the City opposed the

13

motion (Doc. # 54 at 3), but the City then failed to file its response within 14 days as required by Local Rule 3.01(c). Thus, the Court may treat the motion as unopposed.

Even though the affidavit was filed after the discovery deadline, the Court may allow the record to be supplemented "on motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6. The Court finds that Ms. Kamnerdpila's failure to obtain this record until after the deadline was excusable. See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395 (1993) ("Because Congress has provided no other guideposts for determining what sorts of neglect will be considered 'excusable,' we conclude that the determination is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission."). Ms. Kamnerdpila could not have obtained Ms. Thomas's affidavit until the point at which she did because Ms. Thomas was unwilling to come forward to correct her deposition until she had resigned. Thus, Ms. Kamnerdpila may supplement the record with Ms. Thomas's affidavit, and the Court grants the Motion to Supplement.

**B.** <u>**Motion for Summary Judgment**</u>

The City moves for summary judgment on each of Ms. Kamnerdpila's four claims. (Doc. # 48). She raises two claims, one under the FCRA and one under Title VII, asserting discrimination on the basis of race, color, and national origin based on the same facts. (<u>Id.</u>). She raises two claims, one under the FCRA and one under Title VII, asserting retaliation for engaging in protected activity based on the same facts. (<u>Id.</u>). "Because the FCRA is modeled on Title VII, Florida courts apply Title VII caselaw when they interpret the FCRA." <u>Jones v. United Space All., L.L.C.</u>, 494 F.3d 1306, 1310 (11th Cir. 2007). Therefore, the Court will analyze the FCRA claims together with the Title VII claims by consolidating its discussion into two sections between the discrimination claim and the retaliation claim.

### 1. <u>Discrimination Claims</u>

Ms. Kamnerdpila's discrimination claims are based on two different theories: disparate treatment and hostile work environment. (Doc. # 33 at 10-11, 15). The Court evaluates each theory in turn.

### i. <u>Disparate Treatment</u>

The City argues that Ms. Kamnerdpila has failed to establish a prima facie case of discrimination for disparate

treatment or discharge. (Doc. # 48 at 11). The Court disagrees.

"Employment discrimination claims all require proof of discriminatory intent." Trask v. Sec'y, Dep't of Veterans Affs., 822 F.3d 1179, 1191 (11th Cir. 2016). "In order to survive summary judgment . . . , the plaintiff bears the initial burden of establishing a prima facie case of discrimination by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." Lewis v. City of Union City, 918 F.3d 1213, 1220-21 (11th Cir. 2019). For purposes of its Motion, the City concedes that Ms. Kamnerdpila meets the first and third prongs. (Doc. # 48 at 13). However, the Court notes that the City does not explicitly raise any arguments related to the second prong, instead focusing the entirety of its argument on Ms. Kamnerdpila's alleged inability to meet the fourth prong. (Id. at 13-16). Thus, the Court finds that the crux of the parties' dispute is whether she can meet the fourth prong.

The City asks the Court to apply an outdated standard from Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999),

that to be similarly situated to Ms. Kamnerdpila a comparator would need to be "nearly identical." (Doc. # 48 at 16). This standard was abrogated by <u>Lewis</u>, which held that the "nearly-identical test is too strict. We hold, instead — without trying to force an artificial gloss — that a plaintiff must show that she and her comparators are 'similarly situated in all material respects.'" 918 F.3d at 1224. Under this standard, Ms. Kamnerdpila "needn't prove, therefore, that she and her comparators are identical save for their [protected characteristic], as the case may be . . . . Nor will minor differences in job function disqualify a would-be comparator." <u>Id.</u> at 1227. "[A] similarly situated comparator will ordinarily have engaged in the same basic conduct as the plaintiff, will have been subject to the same employment policy, will have ordinarily had the same supervisor, and will share the plaintiff's employment or disciplinary history." <u>McNeal v. Int'l Paper</u>, No. 21-12672, 2022 WL 5434274, at *3 (11th Cir. Oct. 7, 2022) (internal quotations omitted).

Ms. Kamnerdpila has raised a genuine dispute over whether the City "treated 'similarly situated' employees outside her class more favorably." <u>Lewis</u>, 918 F.3d at 1221. Ms. Kamnerdpila points to her own sworn deposition testimony

and that of her co-workers detailing how non-Asian co-workers made similar errors but were not equally disciplined. (Doc. # 51 at 11-14). Presuming her evidence is true at this stage as the Court must, the Court finds that the evidence shows that the City treated similarly situated employees more favorably. Shotz, 344 F.3d at 1164.

The testimony mainly focuses upon two white co-workers, Mr. MacKinnon and Ms. Ridgeway, who were also employees in the billing Department. (Doc. # 52-1 at 2). These employees had the same supervisor and were subject to the same employment policies. Id.; (Doc. # 52-2 at 135, 143); see McNeal v. Int'l Paper, No. 21-12672, 2022 WL 5434274, at *3 (listing whether employees had the same supervisors and were subject to the same employment policies as important considerations). Prior to April 2021 when the events leading to this lawsuit began, there is no record evidence that Ms. Kamnerdpila had any disciplinary history. (Doc. # 52-2 at 139). There is similarly no record evidence that Mr. MacKinnon or Ms. Ridgeway had any disciplinary history either. See McNeal, 2022 WL 5434274, at *3 (listing the similarity between disciplinary histories as an important consideration).

Thus, the critical question is whether these employees engaged in the "same basic conduct" as Ms. Kamnerdpila. Id.

18

In the record, the Court finds significant evidence that Ms.
Ridgeway and Mr. MacKinnon engaged in the same alleged
misconduct as Ms. Kamnerdpila but faced lesser discipline in
response. The Court evaluates this evidence in turn.

Taking her evidence as true, Ms. Kamnerdpila was treated
less favorably than Ms. Ridgeway and Mr. MacKinnon in being
disciplined. Ms. Santiago testified that Ms. Jerome, Ms.
Gewandter, Ms. Thomas, and Ms. Moultin "would give [Ms.
Kamnerdpila] so much work. They purposely would do it because
they knew that she takes her time and (sic) do her work. So
when she doesn't get something completely, she tries to write
her up because they wanted to get rid of [her] at that time,
just as me." (Id. at 36:14-19). When asked whether Ms.
Kamnerdpila was treated differently from her co-workers, Ms.
Santiago said "yeah" and that "one time when [Ms. Kamnerdpila]
had to check adjustment, for example, she was given a certain
time, but I can tell you, for example, Grayson MacKinnon . .
. was given a different time." (Id. at 38:10-16).

Ms. Thomas's affidavit buttresses this testimony. She
avers that Mr. MacKinnon would "not bill on time" and she
"personally witnessed [Ms. Gewandter] placing her hold code
on some of Mr. MacKinnon's accounts to either assist him in
working them or to cover up for him." (Doc. # 54-1 at 2); see

also (Doc. # 52-7 at 17:25-18-2) (Mr. Chisholm testified that Mr. MacKinnon had "numerous issues with his work that seems to kind of just get brushed over, not taken as seriously as other people having issues with their work."). As to Ms. Ridgeway, Ms. Kamnerdpila testified that Ms. Ridgeway "was assigned a rotation job of scanning records to the system, she was a month behind. She didn't get penalized." (Doc. # 52-2 at 23:22-24:2). In contrast, Ms. Kamnerdpila received a written disciplinary notice for failing to complete her work within the prescribed time. (Doc. # 52-2 at 135-36). Therefore, it appears Ms. Kamnerdpila was given more work than her co-workers who had the same job responsibilities but was given less time to complete this work. Then, she was punished for not completing her work in time. Meanwhile, Mr. MacKinnon and Ms. Ridgeway were not punished for being similarly late in their work.

The record also contains evidence that Ms. Ridgeway and Mr. MacKinnon committed similar attendance infractions as Ms. Kamnerdpila. Mr. Chisholm testified that Mr. Mackinnon and Ms. Ridgeway did "not get written up for attendance issues." (Doc. # 52-7 at 17:14-21). Ms. Kamnerdpila testified that Mr. MacKinnon would "call in every Monday during football season for a long period of time. You know, they never got in trouble

as far as . . . getting to being suspended." (Doc. # 52-2 at 23:9-11). In contrast, Ms. Kamnerdpila received a written memorandum for attendance-related misconduct due to calling out of work less than 30 minutes before the start of her workday. (Id. at 137). The City notes that Mr. MacKinnon was in fact disciplined for "chronic absenteeism" resulting in an employee notice. (Doc. # 46 at 7). However, this raises a factual dispute within the record evidence. For the purposes of summary judgment, the Court must presume that the record evidence favorable to Ms. Kamnerdpila is true. Shotz, 344 F.3d at 1164. Thus, the Court concludes that Ms. Kamnerdpila's co-workers were similarly violating the City's attendance policies but, unlike Ms. Kamnerdpila, evaded discipline for doing so.

Despite this substantial evidence detailing allegedly favorable treatment towards Ms. Ridgeway and Mr. MacKinnon, the City argues that they are insufficient comparators because they did not engage in the misconduct which led to Ms. Kamnerdpila's termination - going into work while on FMLA leave. (Doc. # 48 at 16). However, Ms. Kamnerdpila testified that Ms. Ridgeway was allowed to remain in the office after the end of the work-day, which the employment policies prohibited, and Ms. Gewandter and Ms. Thomas knew she was

there but did not punish her. (Doc. # 52-2 at 33:12-34:14). The City claims that Ms. Kamnerdpila's unauthorized presence in the office is categorically different than her co-workers' unauthorized presence in the office because she did so while on FMLA leave. (Doc. # 48 at 16). This distinction is too exacting. See Lewis, 918 F.3d at 1224 ("The nearly-identical test is too strict."). Rather, the Court finds that the similarity of the misconduct engaged in by Ms. Kamnerdpila and Ms. Ridgeway – being in the office when they were not authorized to do so – is sufficient to make Ms. Kamnerdpila "similarly situated in all material respects" to Ms. Ridgeway. Id.; see Pearson v. Georgia through Davis, 806 F. App'x 940, 948-49 (11th Cir. 2020) (finding that plaintiff engaged in same basic misconduct as her comparators when they were illicitly accruing comp time through the manipulations of their time cards, without analyzing whether their methods of manipulation were the same).

Therefore, the Court finds that Ms. Kamnerdpila has established a prima facie case for her discrimination claim. "Once the plaintiff has made a prima facie case, a rebuttable presumption arises that the employer has acted illegally. The employer can rebut that presumption by articulating one or more legitimate non-discriminatory reasons for its action. If

22

it does so, the burden shifts back to the plaintiff to produce evidence that the employer's proffered reasons are a pretext for discrimination." Trask, 822 F.3d at 1191 (internal quotations omitted). In demonstrating pretext, a "plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute her business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and she cannot succeed by simply quarreling with the wisdom of that reason." Alvarez v. Royal Atl. Devs., Inc., 610 F.3d 1253, 1265-66 (11th Cir. 2010).

The City argues that it can rebut the presumption that it acted illegally in disciplining and ultimately terminating Ms. Kamnerdpila. (Doc. # 48 at 17-18). The City cites Ms. Kamnerdpila's consistent violations of various employment policies and management's repeated efforts to counsel her, as legitimate non-discriminatory reasons for her discipline and termination. (Id.); (Doc. # 46 at 1-5); (Doc. # 52-2 at 136-151). However, Ms. Kamnerdpila can point to significant evidence that these reasons are pretextual. See Trask, 822 F.3d at 1191 (requiring plaintiff to "produce evidence that

the employer's proffered reasons are a pretext for discrimination").

As already explained, Ms. Kamnerdpila was committing the same misconduct as her co-workers relating to attendance and completing her work in a timely manner, but was disciplined more severely. This culture of favoritism and selective enforcement conforms with multiple employees' descriptions of the workplace. For example, Mr. Chisholm claimed that Ms. Jerome and Mr. Gewandter "were playing favorites" by refusing to discipline Ms. Ridgeway and Mr. MacKinnon (Doc. # 52-7 at 17:6-21), while Ms. Santiago testified that she and Ms. Kamnerdpila "were getting written up constantly, being talked to constantly, being spoken down to constantly versus the other people." (Doc. # 52-6 at 38:19-23). Ms. Thomas perfectly summarizes these descriptions by claiming that there were "multiple instances where non-Asian Accounting Technicians were not penalized for more serious offenses than those attributed to [Ms.] Kamnerdpila." (Doc. # 54-1 at 1-2).

Additionally, Ms. Kamnerdpila and Ms. Santiago each claim that Ms. Gewandter critiqued them for their supposed accents when speaking English, claiming that she had difficulty understanding them. (Doc. # 52-2 at 25:20-32; Doc. # 52-6 at 46:6-19). There is no direct evidence that Ms.

Gewandter gave less favorable treatment to Ms. Kamnerdpila or Ms. Santiago as a result of her opinions of their English-speaking skills. However, the Court notes that this is one possible explanation for why Ms. Gewandter engaged in a pattern of treating their non-Asian co-workers more favorably.

As Ms. Kamnerdpila was committing the same misconduct as her co-workers, the City's disproportionate discipline cannot form a reasonable exercise of its business judgment. See Alvarez, 610 F.3d at 1265-66 (holding that defendants are entitled to business judgment in consideration of their proffered non-discriminatory reasons). Rather, if all reasonable inferences are made in favor of Ms. Kamnerdpila, then a reasonable juror could conclude that the City's disproportionate discipline was the result of discrimination as the City granted favorable treatment to non-Asian employees. Shotz, 344 F.3d at 1164. Thus, for purposes of summary judgment, the Court finds that Ms. Kamnerdpila has successfully shown that the City's proffered non-discriminatory reasons are pretextual. See Trask, 822 F.3d at 1191 (requiring plaintiff to "produce evidence that the employer's proffered reasons are a pretext for discrimination").

The Court denies the City's Motion in so far as it seeks summary judgment for Ms. Kamnerdpila's claims of discrimination by disparate treatment.

## ii. Hostile Work Environment

The City argues that Ms. Kamnerdpila cannot establish that she was discriminated against through a hostile work environment. (Doc. # 48 at 18-21). The Court agrees.

"To prove a prima facie case of hostile work environment, a plaintiff must establish that: (1) he or she belonged to a protected group, (2) he or she was subjected to unwelcome harassment, (3) the harassment was based on a protected characteristic, (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of his or her employment and create an abusive working environment, and (5) a basis exists for holding the employer liable." Trask, 822 F.3d at 1195.

"The fourth element requires a plaintiff to prove that the work environment is both subjectively and objectively hostile." Adams v. Austal, U.S.A., L.L.C., 754 F.3d 1240, 1249 (11th Cir. 2014). "To evaluate whether a work environment is objectively hostile, [courts] consider four factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or

26

humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Id. at 1250-51 (citation and internal quotation marks omitted). "'No single factor is required' to establish the objective component. Instead, the court is to judge the totality of the circumstances." Nelson v. Keep Smiling Dental, P.A., No. 8:21-cv-189-VMC-JSS, 2022 WL 485244, at *7 (M.D. Fla. Feb. 17, 2022) (citation omitted).

Ms. Kamnerdpila cannot establish that the discrimination she experienced was objectively severe or pervasive to prove a hostile work environment. True, Ms. Kamnerdpila claims that Ms. Gewandter commented negatively on her English-speaking skills. (Doc. # 52-2 at 25:20-23, 146). These comments are certainly offensive and insulting. However, the Eleventh Circuit holds that that the discrimination needs to extend beyond a "mere offensive utterance" to establish a hostile work environment. Adams, 754 F.3d at 1250-51; see also Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) ("[M]ere utterance of an epithet which engenders offensive feelings in a[n] employee, does not sufficiently affect the conditions of employment to implicate Title VII." (internal quotation and citation omitted)). Thus, Ms. Gewandter's derogatory comments were insufficient to establish a hostile work environment.

See Thomas v. NHS Mgmt., LLC, No. 2:23-CV-443-RAH, 2024 WL 1054567, at *4 (M.D. Ala. Mar. 11, 2024) ("The 'mere utterance of an ethnic or racial epithet,' even when directly aimed at the plaintiff, is not sufficient." (quoting Rogers v. E.E.O.C., 454 F.2d 234, 238 (5th Cir. 1971)).

This type of conduct is far less significant than that held sufficient to survive summary judgment by other courts. See, e.g., Hedgeman v. Austal, U.S.A., L.L.C., 866 F. Supp. 2d 1351, 1364 (S.D. Ala. 2011) (holding that hostile work environment claim based on racial harassment survived summary judgment where Caucasian co-workers and supervisors referred to African Americans by racial slurs "on an almost daily basis during [plaintiff's] employment," plaintiff "regularly encountered racial graffiti" in the workplace bathrooms, and "images of the Confederate flag . . . permeated the workplace as regularly displayed and/or worn on Caucasian co-workers' t-shirts"); Nelson, 2022 WL 485244, at *6 (hostile work environment claim survived summary judgment where plaintiff's supervisor called plaintiff a "'stupid black b___' on more than five occasions and 'possibly' on more than 10 occasions over a two-year period," "taunted [plaintiff] about being late, saying that was the 'colored people time that they talk about,'" and "made comments about [plaintiff's] eating

28

habits, telling [plaintiff] 'You better stop eating that n-- --- food. You're going to get too fat'").

Additionally, the Court finds insufficient evidence that Ms. Gewandter made the comments frequently. See Adams, 745 F.3d at 1256 (holding that plaintiff needed to "sufficiently establish that she heard the slur frequently"). While Ms. Kamnerdpila alleged that Ms. Gewandter critiqued her English (Doc. # 52-2 at 25:20-23, 146), these allegations do not provide any evidence of the frequency of these comments by Ms. Gewandter.

Having found that Ms. Kamnerdpila has failed to establish that her work environment is objectively hostile, the Court concludes that the City is entitled to summary judgment on Ms. Kamnerdpila's hostile work environment claim. Adams, 754 F.3d at 1249. Accordingly, the Court grants summary judgment to the City on Counts One and Three in so far as they are based upon a hostile work environment.

### 2. **Retaliation Claims**

The City next argues that it is entitled to summary judgment on Ms. Kamnerdpila's retaliation claims. (Doc. # 48 at 22). The Court disagrees.

"To establish a prima facie case of retaliation under Title VII, a plaintiff must prove the following elements: (1)

29

she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision." Pipkins v. City of Temple Terrace, 267 F.3d 1197, 1201 (11th Cir. 2001). The City concedes that Ms. Kamnerdpila can satisfy the first two prongs. (Doc. # 48 at 22).

Thus, the dispute is over whether she can satisfy the third prong. "The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007). Ms. Kamnerdpila asserts that her termination was in retaliation for her filing a complaint to human resources. (Doc. # 33 at 13, 16-17). She submitted her complaint on April 26, 2022, and supplemented the complaint on May 10, 2022. (Doc. # 52-2 at 144-46). She was terminated by the City on May 11, 2022. (Id. at 149-151). Accordingly, the adverse employment action occurred either one or fifteen days after her protected act. This short period between the adverse employment and the protected act is sufficient to establish a causal connection. See Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004) ("We have held that a period as much as one month between the

protected expression and the adverse action is not too protracted."). Having established a causal connection, Ms. Kamnerdpila satisfies all three prongs of the prima facie case for retaliation. See Id. ("A 'close temporal proximity' between the protected expression and an adverse action is sufficient circumstantial evidence of a causal connection for purposes of a prima facie case.").

Nevertheless, the City argues that Ms. Kamnerdpila's retaliation claim must fail for two reasons. (Doc. # 53 at 4-7). On each reason, the City falls short.

First, the City argues that Ms. Kamnerdpila needs to prove that its proffered reason for her termination is pretextual, which she cannot do. (Id. at 4). It is correct that Ms. Kamnerdpila must show that the City's claim that it terminated her because of her violation of FMLA leave is pretextual. See Berry v. Crestwood Healthcare LP, 84 F.4th 1300, 1307 (11th Cir. 2023). ("To prove that an employer's explanation is pretextual, an employee must cast enough doubt on its veracity that a reasonable factfinder could find it 'unworthy of credence.'"). However, the Court already explained in-depth above that the record contains significant evidence that the City's termination of Ms. Kamnderpila was pretextual. Therefore, the City's argument fails because Ms.

Kamnerdpila has successfully "cast[ed] enough doubt" that the City's reasons for her termination was pretextual. Id.

Second, the City argues that Ms. Kamnerdpila's violation of FMLA leave broke the causal chain between her complaint to human resources and subsequent termination. (Doc. # 53 at 5-7). "Intervening acts of misconduct can break any causal link between the protected conduct and the adverse employment action." Henderson v. FedEx Express, 442 F. App'x 502, 506 (11th Cir. 2011). The City argues that Ms. Kamnerdpila's entrance into the office while on FMLA leave was such an intervening act because it was the actual cause of her prompt termination. (Doc. # 53 at 5-7). Perhaps it is the actual cause. But as already explained, the Court finds that, when making all reasonable inferences in Ms. Kamnerdpila's favor, the record contains sufficient evidence that Ms. Kamnerdpila's complaint to Human Resources caused her termination. Thus, the City asks the Court to resolve a factual dispute by adjudicating which party's evidence is correct. For purposes of summary judgment, the Court may not do so. Samples ex rel. Samples, 846 F.2d at 1330 ("If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should

not grant summary judgment."). Therefore, this argument
fails. A jury must ultimately make this determination on the
retaliation claims.

Accordingly, it is now

**ORDERED**, **ADJUDGED**, and **DECREED**:

(1) Defendant City of St. Petersburg's Amended Dispositive
Motion for Summary Judgment (Doc. # 48) is **GRANTED** in
part and **DENIED** in part.

(2) Summary judgment is granted in favor of the City on
Counts One and Three in so far as they are based upon a
hostile work environment.

(3) The case will proceed to trial on the remainder of Counts
One and Three, and on Counts Two and Four.

(4) Plaintiff Thipsukon Kamnerdpila's Motion to Supplement
the Record (Doc. # 54) is **GRANTED**.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this
<u>31st</u> day of March, 2025.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE